# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | * |
| Plaintiff | * |
| v. | * |
| **NICOLAS CRUZ-CANDELA,** | * Criminal No. **PJM 18-290** |
| Defendant. | * |

## **MEMORANDUM OPINION**

Nicolas Cruz-Candela has filed a Motion to Dismiss the Indictment charging him with illegal reentry after a felony conviction (ECF No. 15). He challenges the indictment on subject-matter jurisdiction and due process grounds. For the reasons that follow, the Court will **GRANT** the Motion.

### I. FACTUAL AND PROCEDURAL HISTORY

Cruz-Candela is a native and citizen of Mexico. He apparently entered the United States without documentation on an unknown date in 2003. ECF No. 17-1, Ex. A at 3. In May 2013, he came to the attention of Immigration and Customs Enforcement (ICE) officials while detained on state charges for misdemeanor assault in North Carolina. *Id*. The Department of Homeland Security issued him a "Notice to Appear" (NTA), charging that he was subject to removal. The NTA listed the place for Cruz-Candela's immigration hearing (the ICE Stewart Detention Center in Lumpkin, Georgia), but failed to specify the date or time; rather, it ordered him to appear "on a date to be set at a time to be set." ECF No. 17-2.

Cruz-Candela was detained by ICE pending the decision of the Immigration Judge (IJ) and in fact attended an immigration hearing on July 30, 2013 along with a group of respondents—as

many as fifteen— whose cases were handled together.[1] An audio recording of that hearing indicates that the structure of the proceeding consisted of the IJ asking the group several questions and, generally, telling the group before each question that, if an individual had an affirmative response, he or she was to stand. The IJ would then inquire further of any individual who stood in response to a question.[2]

The IJ first advised the group of their right to have an attorney at their own expense. ECF No. 17 Ex. E, track 2 at 1:00 to 2:31. When the group was asked if any unrepresented respondent wanted additional time to obtain counsel, some respondents stood, and the IJ postponed their hearings. Cruz-Candela did not stand. *Id.*, Track 3 at 1:21 to 1:41 and 3:11 to 3:43. The IJ then stated that he understood that the respondents who remained would be waiving their right to counsel and asked for confirmation if this was the case. His inquiry was apparently followed by an indistinguishable verbal response from the group, which the IJ understood to represent a response of "yes by all" (that they were waiving their right to obtain counsel). *Id.*

The IJ then asked members of the group to stand "… if you want to fight this case or believe the charge against you is wrong in any way." *Id.*, Track 4 at 0:35 to 0:40. No one stood. The IJ said he took that to mean that everyone in the group was admitting the charge or charges against them. In apparent response to the IJ's inquiry, an interpreter is heard saying "yes," which the IJ repeats. There were no audible responses from the group, *id*, at 0:40- 1:26, Cruz-Candela included.

---

1 At the Motions Hearing, the Government represented that the group began with fifteen people and an unspecified number subsequently dropped off as the proceedings were underway, e.g., to secure different interpreters or obtain attorneys. Recording, Nov. 26, 2018, at 3:37 p.m.

2 After Cruz-Candela's Motion to Dismiss was filed, the Government and Cruz-Candela received an audio recording of the underlying removal proceedings. Insofar as possible, the recording memorializes the interactions described herein. The Government addressed the recording in its Response in Opposition to Cruz-Candela's Motion to Dismiss, and Cruz-Candela raised new arguments based on the recording in his Reply. Because the Court and the parties discussed these arguments at the Motions Hearing, the Court considers them here.

The IJ thereupon found all remaining respondents to be removable as charged, based on clear and convincing evidence. *Id.*

The IJ then told the group about the availability of certain forms of relief, one of which — voluntary departure as opposed to deportation[3]—Cruz-Candela was eligible for. The IJ told the group that, to be eligible for voluntary departure, they would "need money to pay for [their] own airfare" and have a travel document. *Id*, Track 5 at 3:16-3:57.

Finally, the IJ asked each respondent individually whether he or she wanted to appeal. When the IJ asked whether he wanted to appeal instead, Cruz-Candela apparently chose to accept deportation. *Id.*, Track 6 at 3:09-3:50.[4]

Accordingly, the IJ ordered Cruz-Candela's removal, and on August 8, 2013, he was removed. Cruz-Candela appears to have re-entered the U.S. illegally several times thereafter, since between 2014 and 2017 the Order of Removal was reinstated on at least seven occasions. In April 2018, he was taken into custody by ICE officials, which gave rise the present case.

He is challenging the original Order of Removal which, if successful, would also invalidate its subsequent iterations.

## II. LEGAL STANDARD

Under 8 U.S.C. § 1229(a), when immigration authorities suspect an individual is present in the United States without authorization, in order to initiate removal proceedings they must serve the individual with written notice specifying, among other things, the time and place at which the proceedings will be held. 8 U.S.C. § 1229(g).

---

[3] Like deportation, voluntary departure requires the respondent to leave the United States. However, unlike deportation, he or she leaves at his or her own expense and avoids the legal consequences of deportation that could affect future efforts to return to the U.S. or to apply for a visa. Track 5 at 3:16-3:32.

[4] Cruz-Candela's response to the Immigration Judge's question cannot be heard on the audio recording, but the interpreter rendered it as "I accept deportation."

To successfully attack an underlying deportation order, a defendant must show that (1) he has "exhausted any administrative remedies that may have been available to seek relief against the [deportation] order"; (2) the deportation proceedings "improperly deprived [him] of the opportunity for judicial review"; and (3) the entry of the deportation order was "fundamentally unfair." The fundamental unfairness prong requires a showing both that the defendant's "due process rights were violated by defects in his underlying deportation proceeding" and that he "suffered prejudice as a result of the defects." *United States v. Wilson*, 316 F.3d 506, 510 (4th Cir. 2003), *abrogated on other grounds by Lopez v. Gonzalez*, 549 U.S. 47 (2006).

The exhaustion requirement of 1326(d)(1) is excused where a person's failure to exhaust results from an invalid waiver of the right to an administrative appeal. *U.S. v. Ortiz*, 488 Fed.Appx. 717, 718 (4th Cir. 2012). A valid waiver of rights must be knowing and intelligent. The Government bears the burden of demonstrating this by at least a preponderance of the evidence.[5] *Narine v. Holder*, 559 F.3d 246, 249-50 (4th Cir. 2009).

### III. ANALYSIS

Cruz-Candela moves to dismiss the Indictment by challenging his original Order of Removal, and therefore all subsequent reinstatements. Because the original removal was invalid, he says, it cannot be the basis of the present charge of illegal reentry.

Cruz-Candela argues first that the Supreme Court's holding in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), invalidates his original NTA, as a result of which the Immigration Court lacked

---

[5] Cruz-Candela argues that the appropriate standard of proof is by clear and convincing evidence, citing a case from the Ninth Circuit, *U.S. v. Reyes-Bonilla*, 671 F.3d 1036, 1043 (9th Cir. 2012). The Government argues that because an immigration proceeding is a civil proceeding, the Court should apply a preponderance standard. Although it is not clear what standard the Fourth Circuit would endorse, at least one court in this District has cited *Reyes-Bonilla* to the effect that the clear and convincing evidence standard is applicable. *See U.S. v. Merino-Hernandez*, 46 F.Supp. 3d 602, 807 n. 7 (D. Md. 2014).

-4-

subject matter jurisdiction to order him removed. Second, he argues that the removal proceeding was fundamentally unfair— that it violated his due process rights and unduly prejudiced him. The Government disagrees in all respects.

A. **Subject Matter Jurisdiction After Pereira**

In *Pereira v. Sessions*, the Supreme Court considered whether an NTA for removal proceedings that "fails to specify either the time or place of the removal proceedings" triggers the stop-time rule that ends any period during which a person would otherwise be considered to have had a continuous physical presence in the United States when that person is served with an NTA.[6] 138 S. Ct. at 2110. Pereira had been issued an NTA that, like Cruz-Candela's, only ordered him to appear on a date to be set at a time to be set. *Id.* at 2112. Pereira, however, was not incarcerated pending his proceeding and, due to an administrative error in the mailing of a more specific summons, never received notice of the precise date and time of his proceedings. He was ordered removed *in absentia* but, unaware of the removal order, continued to live in the United States. *Id.* Several years later, after he had been living in the United States for more than ten years, Pereira was arrested, and the removal proceedings were reopened. Pereira applied for cancellation of the proposed removal, arguing that the stop-time rule did not preclude his eligibility for cancellation because it was not triggered by the original, deficient NTA. *Id.* The Supreme Court agreed, holding that "a putative Notice to Appear that fails to designate the specific time or place of the noncitizen's

---

[6] Certain nonpermanent residents who are subject to removal proceedings can have their removal cancelled if they have had at least ten years of continuous physical presence in the United States immediately preceding the application for cancellation. The stop-time rule provides that the period of continuous presence ends when a respondent is served with an NTA per 8 U.S.C. § 1229(a). *Pereira*, 138 S.Ct. at 2109.

removal proceedings is not a 'notice to appear under section 1229(a),' and so does not trigger the stop-time rule." *Id.* at 2113-14. Pereira was thus eligible for cancellation of the removal order.

Cruz-Candela argues that, although the Supreme Court in *Pereira* was considering the effect of a deficient NTA for the limited purpose of its application to the stop-time rule, its rationale was based on the definition of what constitutes a valid NTA which, he says, necessarily must include the date and time of removal proceedings. If an NTA is deficient *qua* charging document and does not trigger the stop-time rule, the argument goes, it is similarly deficient in the sense that it does not establish the immigration court's jurisdiction to remove an individual; accordingly any illegal reentry conviction flowing from the deficient NTA is similarly invalid. His removal order, says Cruz-Candela, was *ultra vires* and void. He cites to a Fourth Circuit case which emphasized the "necessarily narrow" standard of review under the *ultra vires* standard, *see Ancient Coin Collectors Guild v. United States Customs & Border Prot.*, 698 F.3d 171, 179 (4th Cir. 2012), suggesting that an agency action performed without statutory authority is null and void, even if reasonable or otherwise meritorious. The Supreme Court, he insists, clearly stated that its definition of a valid "Notice to Appear" is "definitional" per the terms of § 1229(a).

The Government argues that the Supreme Court's decision in *Pereira* does not apply. Not only was that decision of very limited scope, it says, but the immigration court's jurisdiction over the underlying removal proceedings is established by regulation, not by 8 U.S.C. § 1229(a)(1). Thus, 8 C.F.R. § 1003.13 provides that jurisdiction vests in the immigration court when an NTA, which is the relevant charging document, is filed. The regulation does not cross-reference the statutory discussion of what constitutes an NTA per 8 U.S.C. § 1229(a)(1), and does not include

the requirement that an NTA include the time or place of the immigration proceedings.[7] Accordingly, says the Government, Cruz-Candela's removal order was fully valid.

Several courts have grappled with this question and have reached different conclusions.

Some have held that an NTA that fails to specify the time and date of proceedings is not a valid charging document and does not vest jurisdiction in the immigration court. *See United States v. Virgen-Ponce*, 320 F. Supp. 3d 1164, 1166 (E.D. Wash. July 26, 2018) ("Since the Notice of Appearance in this case omits information required by the statute, the Notice is deficient. The IJ lacked jurisdiction over Defendant's case because of the deficient notice."); ECF No. 15-4 (Redacted decision by Immigration Judge Denise Slavin, August 27, 2018) (granting a Motion to Terminate removal proceedings because the reasoning of *Pereira* "applies in any context"), ECF No. 15-5 at 6 (Redacted decision by Immigration Judge Lori Bass, August 10, 2018) (terminating removal proceedings because "[r]emoval proceedings begin with the filing of a Notice to Appear as defined in INA § 239(a), which has not yet transpired. 8 C.F.R. §§ 1003.13, 1103.14(a); *see Pereira*"), ECF No. 15-6 at 3-4 (Redacted decision by Immigration Judge Robert Hough, July 23, 2018) (terminating removal proceedings because "[b]y holding that the inclusion of time and place information is *mandatory* rather than information solely to be included "where practicable," the Court [in *Pereira*] necessarily establishes that 8 C.F.R. § 1003.18(b) is no longer good law to the extent it suggests that a putative "Notice to Appear" may be considered a Notice to Appear, later to be perfected by a DOJ-issued Notice of Hearing [including the date and time]"), *United States*

---

[7] The Government argues specifically that 8 C.F.R. § 1003.14(a) states that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." For all proceedings "initiated after April 1, 1997," a "charging document" is defined by a separate regulation to "include a Notice to Appear." 8 C.F.R. § 1003.13. Yet another regulation—8 C.F.R. § 1003.15(b)-(c)—lists the specific items that should be included in a notice to appear filed with the immigration court for jurisdictional purposes. Neither § 1003.15(b) nor § 1003.15(b)-(c) list the time and date of the removal proceedings as required criteria for a notice to appear filed with the immigration court for jurisdictional purposes.

*v. Ortiz*, 3:18-CR-00071-RWG, 2018 WL 6012390 (D. N.D. Nov. 7, 2018) (dismissing an indictment and reasoning that "the Supreme Court stated that a Notice to Appear is invalid without designating the time and place and it was on this basis that the stop-time rule was not triggered. Indeed, the Court did not limit its analysis to notices to appear entered pursuant to section 1229b(d)(1)(A)'s stop-time rule."), *United States v. Cruz-Jimenez*, A-17-CR-00063-SS, 2018 WL 5779491 (W.D. Tex. Nov. 2, 2018) (finding that *Pereira* "says that [an NTA without specifying the date and time] is not a notice to appear *at all*" and therefore "because no proper charging document was filed, jurisdiction never vested with the immigration court.").

Other courts have found that the holding in *Pereira* is limited, and does not deprive immigration courts of jurisdiction where the NTA failed to specify the date and time of proceedings. *See, e.g.*, *United States v. Ibarra-Rodriguez*, No. CR-18-190-M, 2018 WL 4608503, at *2–3 (W.D. Okla. Sept. 25, 2018) (distinguishing *Pereira*, holding that an initial NTA lacking a specific date and time did "not automatically make the removal order fundamentally unfair," and concluding that the defective NTA was cured where the defendant later received notice of the hearing date and appeared in immigration court); *Ramat v. Nielsen*, 317 F. Supp. 3d 1111, 1116 (S.D. Cal. 2018) ("Nothing in *Pereira* suggests that the failure to specify the date and time of removal proceedings in 8 U.S.C. § 1229(a) voids the commencement of removal proceedings."); *United States v. Cortez*, No. 6:18-cr-22, 2018 WL 6004689 (W.D. Va. Nov. 15, 2018) (explaining that *Pereira* does not render the immigration court's authority void because 8 C.F.R. § 1003.14(a), not *Pereira* nor 8 U.S.C. § 1229(a), dictates when jurisdiction vests with the immigration court); *United States v. Munoz-Alvarado*, No. CR-18-171-C, 2018 WL 4762134, *1 (W.D. Okla. Oct. 2,

2018) (finding the defendant's appearance at his immigration hearing and his waiver of further notice "overcome[s] the deficiencies noted by the Supreme Court in *Pereira*").

Still other courts have found that, while an NTA lacking a date and time is deficient under *Pereira*, a defendant making a challenge, as Cruz-Candela does here, still may not be able to prevail. *See, e.g., United States v. Larios-Ajualat*, No. 18-10076-JWB, 2018 WL 5013522, at *4 (D. Kans. Oct. 15, 2018) (finding that although "Defendant's notice to appear was clearly defective under *Pereira*, as it did not include a specific date and time to appear," he nevertheless did not show that the proceedings improperly deprived him of judicial review pursuant to 8 U.S.C. § 1326(d), and his jurisdictional argument did not save his case).

In the one relevant case from this District, *United States v. Ordoñez*, 328 F.Supp.3d 479 (D. Md. 2018) (Grimm, J.), relying on the *Pereira* decision, the defendant also challenged an immigration court's jurisdiction to issue a deportation order based on the sufficiency of the notices he received. Judge Grimm dismissed the indictment on other grounds, but noted that because Ordoñez had not shown that he did not actually receive notice of his hearing, or establish that he did not waive that argument, "his jurisdictional challenge appear[ed] to be without merit." *Id*. at 500.

The Court sides with those courts that have held that an NTA that fails to specify the time and place of a hearing is deficient and deprives the immigration court of jurisdiction. True, the Supreme Court in *Pereira* took care to specifically note that it was limiting the question before it to the "narrow question" of whether a "document that is labeled 'notice to appear,' but [which] fails to specify either the time or place of the removal proceedings… *trigger[s] the stop-time rule*." 128 S.Ct. at 2110 (emphasis added). But the Court reached that conclusion by defining what it

means to be a valid "Notice to Appear" by specific reference to Section 1229(a), and then applied that definition to the stop-time rule.

The Court therefore clearly established that the definition of what constitutes a valid NTA appears in Section 1229(a). To the extent that the regulation states otherwise, it is trumped by the statute.

Cruz-Candela is correct. The original NTA was deficient such that the original immigration court lacked jurisdiction to entertain his case. The subsequent incantations of the original Order of Removal are also null and void.

### B. Due Process Challenge

Cruz-Candela also argues that his due process rights were violated during his original removal proceeding.

As indicated, his collateral attack on the underlying deportation order must meet three requirements to be successful: First, he must have exhausted any administrative remedies available to him; Second, he must have been improperly denied judicial review; and Third, the entry of the deportation order must have been fundamentally unfair. *United States v. Lopez-Collazo*, 824 F.3d 453, 458 (4th Cir. 2016); 8 U.S.C. § 1326(d); *United States v. El Shami*, 434 F.3d at 659, 663 (4th Cir. 2005). "[I]f the defendant satisfies all three requirements, the illegal reentry charge must be dismissed as a matter of law." *Id*. The Court considers those elements in the present case.

Cruz-Candela first argues that his failure to exhaust any administrative remedies he may have had is excused because, as will be shown, he did not waive his right to such review. Courts in this District have been clear that an invalid waiver will excuse an individual's failure to show that he exhausted available administrative remedies and will suffice to show that the deportation proceedings deprived the respondent of the opportunity for judicial review. *See, e.g.*, *United States v. Lopez-Collazo*, 824 F.3d 453, 459 (4th Cir. 2016); *United States v. Ortiz*, 488 Fed.Appx. 717,

718 (4th Cir. 2012) ("Courts have generally held that the exhaustion requirement [of § 1326(d)(1)] must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal.") (internal citations omitted). Under the circumstances, the Court finds Cruz-Candela was effectively deprived of his right to appeal.

Cruz-Candela expands on his claim that he was improperly denied judicial review. It is true that he eventually did appear for a hearing, so to that extent he obviously was not denied a physical hearing. The gravamen of his Complaint, however, is not merely that he was not given a forum to be heard; it is rather that he did not knowingly and intelligently understand what rights he had at the hearing, and, more specifically, that he did not knowingly and intelligently waive his right to do or say certain things at that time. He claims not only that he did not knowingly and intelligently waive his right to be heard or to contest the charges against him. More to the point, he disputes that his waiver of the right to appeal or to pursue voluntary departure was knowing and voluntary.

A waiver is invalid if it is not knowingly and intelligently made, *Narine v. Holder*, 559 F.3d 246, 249-50 (4th Cir. 2009). The burden is on the Government to prove that a waiver was knowing and intelligent. *United States v. Merino-Hernandez*, 46 F.Supp.3d 602, 606 (D. Md. Sept. 3, 2014) (citing *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1043 (9th Cir. 2012)).

The Court considers first the format of Cruz-Candela's original hearing.

Cruz-Candela was part of a group at the hearing, which consisted of up to 15 potential deportees appearing before a single IJ. *See* p. 2, fn. 1, *supra*. The hearing was structured so that the IJ asked the group collectively several questions and, generally, before each question, told the group that if an individual had an affirmative response, he or she was to stand. The IJ then questioned any individual who stood in response to a question. First, the IJ advised the group of their right to have an attorney at their own expense and asked them to stand if they wanted to

procure one. Cruz-Candela did not stand. Next, the IJ asked the group if they wanted to "fight" the cases against them or believed the charges were wrong in any way. Cruz-Candela and others did not stand, which the IJ took to mean that they were admitting the charge or charges against them. Next, the IJ undertook to explain the concept of voluntary departure, but indicated that any respondent choosing that option would have to pay for his or her own airfare.[8] Cruz-Candela did not stand to indicate that he wished to pursue that option. Finally, the IJ held individual colloquies to ask the respondents if they wanted to appeal or, in lieu of that, accept deportation. Cruz-Candela apparently said he accepted deportation.

Cruz-Candela argues here that because of the group nature of the hearing, it is impossible to know if any person who failed to stand in response to questions posed to the entire group heard the IJ's questions, understood them, or knowingly and intelligently answered them. The Court is compelled to agree. It simply is not in a position to conclude that Cruz-Candela in fact: (a) understood that he had a right to counsel and that he could take additional time to obtain counsel at his own expense; (b) understood or indeed intended to admit the charge against him; (c) understood that he had the option of seeking voluntary removal as opposed to appealing; or (d)

---

[8] The Government describes the colloquy as follows:

> The IJ then addressed potential forms of relief from removal, but the Defendant did not indicate he was eligible for any such relief. With respect to voluntary departure, the IJ explained, "This doesn't allow you to stay in the United States, but it allows you to avoid the legal consequences of removal which may make it easier for you to return to the United States or to qualify for a visa." (*Id.*, Track 5 at 3:12-3:43.) But he correctly cautioned this would require the alien to leave the United States at his own expense. (*Id.*, Track 5 at 3:43-3:58.) He asked anyone interested in asking for voluntary departure to stand, but none of the respondents (including the Defendant) indicated any interest. (*Id.*, Track 5 at 3:58-4:08.) The IJ cautioned the Defendant and the other alien respondents that they could face criminal penalties of up to twenty years in prison for reentering the United States illegally after removal. (*Id.*, Track 5 at 4:08-4:43.)
>
> ECF No. 17 at 3.

understood that he could travel back to Mexico by a land vehicle instead of having to purchase a plane ticket.

The seminal Supreme Court case on collateral challenges to removal proceedings is *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987). There the Supreme Court considered whether group respondents' due process rights had been violated when the IJ failed to adequately explain their rights to relief or to appeal. *Id*. at 831, 830. The Court accepted the conclusion of the lower courts that respondents' due process rights were violated in such circumstances, concluding that "[b]ecause respondents were deprived of their rights to appeal, and of any basis to appeal since the only relief for which they would have been eligible was not adequately explained to them, the deportation proceeding in which these events occurred may not be used to support a criminal conviction." *Id.* at 842.

In the years since *Mendoza-Lopez*, numerous decisions in this Circuit have granted relief to petitioners, citing the importance of ensuring that respondents understand what is happening and that they know what they are doing when they waive their rights. *See, e.g.*, *United States v. Merino-Hernandez*, 46 F.Supp.3d 602, 608 (D. Md. 2014) (holding that a defendant's waiver was not knowing and voluntary where only some parts of the documents in the underlying deportation proceedings were explained to him in Spanish); *United States v. Lopez-Collazo*, 824 F.3d 453, 462 (4th Cir. 2016) (affirming the district court's conclusion that a Spanish-speaking defendant's due process rights were violated where he was not provided an interpreter during the underlying immigration proceedings) (remanded on other grounds). Courts in other Circuits have explicitly found that group waivers can violate a respondent's due process rights when the waivers are not knowing and intelligent. For instance, in *United States v. Ahumada-Aguilar*, 295 F.3d 943 (9th Cir. 2002), the Ninth Circuit found that a respondent had not knowingly and intelligently waived

his right to counsel where the Immigration Judge used a procedure that required respondents to stand and speak in response to a question to the group if they did <u>not</u> want to assert their right to counsel (Compare the current procedure in the present case, where the IJ asked Cruz-Candela and others to stand if they <u>did</u> want to assert a right). The Ninth Circuit relied on *United States v. Lopez-Vasquez*, 1 F.3d 751 (9th Cir. 1993), in which the Ninth Circuit had held that a "mass silent waiver impermissibly presumes acquiescence in the loss of the right… and fails to overcome the presumption against waiver." (internal quotations omitted).

In the case at bar, the Court finds the record essentially silent on the question of whether Cruz-Candela's waivers were knowing and voluntary. More particularly, no record evidence is available to indicate that Cruz-Candela understood what the option of voluntary departure, as opposed to deportation, consisted of. As a result, the Court finds that Cruz-Candela's rights to due process were violated. The Government has not met its burden to prove that his waivers were knowing and voluntary (which, as indicated, excuses any failure to exhaust administrative remedies or seek judicial review).

The final question is whether these due process violations prejudiced Cruz-Candela. The Court finds that they do.

The Fourth Circuit "requires a defendant to prove a reasonable likelihood that, but for the errors complained of, he would not have been deported." *United States v. Cisneros-Garcia*, 159 Fed.Appx. 464 at *2 (4th Cir. 2005).

Cruz-Candela argues he was prejudiced because, if he had understood his rights and more particularly, if the IJ had properly explained voluntary departure more thoroughly and correctly, he likely would have asked for and been granted voluntary departure. At oral argument on Cruz-Candela's Motion before this Court, the Government argued that there is no evidence that Cruz-

Candela would have sought voluntary departure had he understood that he would not necessarily have been required to buy a plane ticket. For example, says the Government, he did not inquire about the cost of voluntary departure. This, of course, assumes Cruz-Candela knowingly understood what he was being told about voluntary departure in the first place.

The Court also concludes that there was a reasonable likelihood that Cruz-Candela would have asked for and been granted voluntary departure had he understood what the IJ was telling him. He was therefore prejudiced.

Under 8 C.F.R. § 1240.26, an IJ may grant voluntary departure before the completion of removal proceedings if the respondent: (1) seeks voluntary departure at or before the first master calendar hearing before an Immigration Judge; (2) makes no additional requests for relief; (3) concedes removability; (4) waives appeal of all issues; and (5) has not been convicted of an aggravated felony or is deportable for national security issues. Once the IJ establishes that a person is eligible, the IJ weighs the positives against the negatives, and exercises broad discretion over whether to grant voluntary departure. *See Matter of Arguellos-Campos*, 22 I. & N. Dec. 811, 817 (BIA 1999) (*en banc*). Congress intended for the authority to grant voluntary departure to be generously applied, *id.*, and immigration regulations are explicit that the Immigration Judge must inform a respondent of his apparent eligibility for relief. 8 C.F.R. § 1240.11(a). In this case, with all respect to the IJ, his dive into the issue was too shallow.

At the time of his initial removal proceeding, Cruz-Candela was 24 years old, had come to the country from Mexico to work, and had been employed prior to his arrest. He had two children in North Carolina, where he lived and worked, both of whom were (and are) United States citizens.

His criminal record was minimal, consisting of convictions for driving while intoxicated and misdemeanor assault. As to those, he had been given probationary sentences, no jail terms.

As Cruz-Candela points out, courts have considered and ordered voluntary departure to people with much more extensive criminal records. *See, e.g.*, *In re Gonzales-Figeroa*, A29013696, 2006 WL 729784 (BIA Feb. 10, 2006) (affirming grant of voluntary departure where petitioner had four convictions for assault, one conviction for resisting arrest, and numerous arrests); *In re Pineda-Castellanos*, A77212443, 2005 WL 3833024 (BIA Nov. 16, 2005) (affirming grant of voluntary departure where criminal history included six criminal convictions including battery, drunkenness, and driving under the influence). In addition to his comparatively mild criminal record, Cruz-Candela's children in the U.S. will remain here. He appears to have been responsibly employed while here. In all likelihood he would have been granted voluntary departure had he understood what the option entailed and had he known to ask for it.

## IV. CONCLUSION

For the foregoing reasons, Cruz-Candela's Motion to Dismiss the Indictment, ECF No. 15, is **GRANTED**.

A separate Order will **ISSUE**.

/s/<br>
**PETER J. MESSITTE**<br>
**UNITED STATES DISTRICT JUDGE**

July 3, 2019